# United States Court of Appeals
## For the First Circuit

---

No. 00-2440

MARK A. KIBBE,

Petitioner, Appellee,

v.

LARRY E. DUBOIS, ET AL.,

Respondents, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

---

Before

Torruella, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

---

Annette C. Benedetto, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellants.
Brownlow M. Speer, on brief, for appellee.

---

October 23, 2001

**TORRUELLA, Circuit Judge.** Appellee Mark A. Kibbe ("Kibbe") was charged with arson of a dwelling house in Hampden County court in Massachusetts. He was tried before a jury on June 9 and 10, 1992, and found guilty of the lesser included offense of arson of a building. After exhausting state court remedies, Kibbe petitioned for the writ of habeas corpus. The district court granted Kibbe's petition, ruling that the prosecutor's reference to Kibbe's post-Miranda silence during cross examination and closing arguments was unconstitutional. Because we conclude that Kibbe has not satisfied his burden under the exacting standards of 28 U.S.C. § 2254(d) as amended by the Antiterrorism and Effective Death Penalty Act of 1996, we reverse the district court's decision to grant Mark Kibbe's petition for the writ of habeas corpus.

## BACKGROUND

### A. Facts Elicited from the Trial Testimony

On November 15, 1991, at approximately 11:15 in the evening, Paul Martin walked outside of his parents' house and saw that the unoccupied house at 171 Almira Road was heavily engulfed in smoke. He also heard crackling noises consistent with a fire. Martin returned to his parents' house, told his mother to call "911," and returned to the street. From this vantage point, Martin observed a man who was wearing what appeared to be a down, either red or orange, brightly-colored jacket. The unidentified man walked from the backyard of 171 Almira down the driveway to the edge of the road. When the sound of sirens

was audible, the man walked back up the driveway in the direction from which he had come.

Within a few minutes, Detective Albert Witkowski and Officer Eugene Rooke, both members of the Springfield police department, arrived at the scene. They spoke with Martin, who told them that he had observed a man come from the backyard. Witkowski went to the backyard to investigate, where he saw a person in the rear corner of the yard wearing a red jacket and holding an object in his hand. Witkowski testified at trial that he identified himself as a police officer and asked the man if he could talk with him for a moment. In response, the man, later identified as Kibbe, ran. Witkowski gave chase and radioed for assistance. Officer Rooke, who had continued to interview Martin, responded to Witkowski's request and joined the chase. Rooke ran down Newfield Street, ordering Kibbe to stop, which allegedly only hastened his flight. The chase continued, terminating only after Kibbe fell in the wooded area in which he was running. Kibbe was wearing a red, heavy winter jacket and black gloves. He also had black soot marks on his nose and smelled of smoke. The officers recovered a flashlight and a small propane tank that Kibbe had dropped during his flight.

The officers advised Kibbe of his Miranda rights and asked him to return to the police cruiser. There, they placed him under arrest and told him that they would conduct a pat-down search on him

-4-

for weapons.  Hearing this, Kibbe voluntarily removed matches, paper towels, a pipe, and pipe tobacco from his pockets.  The officers then had a brief conversation with Kibbe.  Witkowski testified that Kibbe answered his questions and told him why he was in the area.

At trial, Kibbe took the stand and offered the following testimony.  On the night in question, he attended an Alcoholics Anonymous meeting until approximately 9:00 p.m., and then took a bus home.  Once he arrived at home, he immediately went out again to smoke his pipe, because he was not allowed to do so in the house.  He walked all around the neighborhood and found a flashlight and propane tank in the woods.  He then went into the backyard of 171 Almira Road because he needed to urinate.  There, he noticed smoke coming from the back of the house.  After several minutes, he walked to the front of the house and, upon hearing a siren, he turned around and walked into the backyard.  He then "got scared" and ran away, allegedly because he was on parole.  After he was apprehended by Rooke, Kibbe testified that the officers "questioned me as to what I was doing," and that he "answered them over and over again."

Kenneth Friberg, the arson investigator who was at the scene, also testified.  Once the fire was extinguished and the smoke had cleared, Friberg entered the cellar at 171 Almira to determine the cause of the fire.  There, he found an empty matchbook on top of a pile of lumber about twenty feet from the cellar door.  There was also some

paper and rubbish in the cellar.  He could not identify what kind of paper it was due to its charred and sodden state.  From these and other observations, Friberg concluded that the fire had been deliberately set by an open fire without the use of accelerants.  He found paper towels just outside and to the left of the cellar door.[1]

## B.  Relevant Excerpts from the Trial Transcript

As noted above, Kibbe took the stand in his own defense, offering an explanation for his presence at 171 Almira Road, his flight from the police, and his possession of the matches, paper towels, flashlight, and propane tank.  On direct examination by his attorney, the following exchanges occurred:

> Q.  And now, why did you run?
> A.  I'm on parole.
> ***
> Q.  And after [Rooke] brought you back to the car what did you do?
> A.  They questioned me as to what I was doing. I answered them over and over again. . . .
> Q.  All right.  When they were questioning you what did you tell them?[2]
> A.  I told them what had happened.

During cross-examination, the Commonwealth asked Kibbe:

> Q.  You didn't tell the police that you ran because you were on parole, right?

---

[1] The Commonwealth alleges that Friberg found the paper towels inside the cellar.  Kibbe disputes this claim, and our review of the record supports his assertion that Friberg testified to having found the paper towels just outside of the cellar door.

[2] The Commonwealth objected to this question, but the court allowed it to be answered.

```
A.  No, I did not.
Q.  You never told them why you ran?
A.  I don't believe I did.
```

Both Kibbe and the Commonwealth commented at trial on Kibbe's forthrightness, or lack thereof, in his conversation with the police on the night of the fire.  In his opening statement Kibbe's attorney said:

> [Kibbe] was stopped a short distance away, spoke to the police.  They spoke to him and he explained what he was doing and what the situation was on that evening.

In closing, Kibbe's attorney reinforced this point:

> What about Mr. Kibbe? Mr. Kibbe told the police what he was up to that night. He didn't have to, but he did.  He told you on the stand where he went that night.  He didn't have to, but he did.

To counter, the Commonwealth said during closing argument:

> And [Kibbe] tells you he runs because he is on parole, but you know he didn't tell the police that, didn't offer that as an explanation for what he was doing.  In a case where you're the finders of the facts, you have to decide credibility.  You have to decide credibility. You must decide whether you believe what Mark Kibbe said.  Whether it had a ring of truth or whether it didn't.  If you don't believe what Mark Kibbe said, Mark Kibbe is guilty.
>                    ***
> There's a reasonable inference, the inference of guilt of consciousness, guilt from his flight. The explanation that he offered to you is not worthy of believing.  This is a fanciful explanation, not one that comports with your idea of common sense.
>                    ***
> It is not a reasonable story.  It is the one arrived at after the facts to mislead you.

## C.  Procedural History

After Kibbe's jury trial and conviction, the case proceeded to the Appeals Court for the Commonwealth of Massachusetts.  In a Memorandum and Order, the court affirmed Kibbe's conviction. Commonwealth v. Kibbe, 646 N.E.2d 1097 (Mass. App. Ct. 1995) (affirming judgment only), No. 93-P-1761 (Mar. 3, 1995) (mem. and order under Rule 1:28).  Relying in large part on Anderson v. Charles, 447 U.S. 404 (1980), and Commonwealth v. McClary, 604 N.E.2d 706 (Mass. App. Ct. 1992), the court rejected Kibbe's argument that the Commonwealth's cross-examination and closing argument violated the rule established in Doyle v. Ohio, 426 U.S. 610, 617-19 (1976), prohibiting the use of post-Miranda silence to impeach a defendant.  Kibbe, No. 93-P-1761 at 2.[3]  The Court ruled that since Kibbe had spoken to police about "all matters concerning the charge for which he was arrested," the Commonwealth was permitted to question Kibbe about any omissions in his story.  Id. at 3.  In support, the court quoted McClary: "if a defendant does not elect to remain silent but speaks to the police about matters concerning the crime for which he has been arrested, the

---

[3] Kibbe also challenged the Commonwealth's comment during closing argument that: "If you don't believe what Mark Kibbe said, Mark Kibbe is guilty."  The appeals court found that the remark, while improper, was sufficiently neutralized by the judge's instructions to the jury regarding the burden of proof and the closing arguments of counsel. Kibbe, No. 93-P-1761 at 4.  On habeas review, the district court found that the error was harmless when considered on its own.  Kibbe v. Dubois, 120 F. Supp. 2d 114, 133 (D. Mass. 2000).  Kibbe does not appeal this conclusion.

-8-

prosecutor may ask the defendant about any omission from his post-Miranda statement which is at variance with his trial testimony." 604 N.E.2d at 710. The Massachusetts Supreme Judicial Court denied Kibbe's request for further review. Commonwealth v. Kibbe, 648 N.E.2d 1286 (Mass. 1995).

Kibbe next petitioned for a writ of habeas corpus in the federal district court of Massachusetts, which was granted in a Memorandum and Order on September 26, 2000. Kibbe v. Dubois, 120 F. Supp. 2d 114 (D. Mass. 2000). In analyzing Kibbe's alleged Doyle violation, the district court first found that the claim was subject to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), petitioner's case having been filed in January of 1997. Kibbe, 120 F. Supp. 2d at 118. As such, Kibbe's writ must be denied unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

After reviewing the Supreme Court's most comprehensive interpretation of AEDPA in Williams v. Taylor, 529 U.S. 362 (2000), the district court held that the Massachusetts appeals court decision was

both contrary to and involved an unreasonable application of clearly established federal law as determined by the Supreme Court.[4] Kibbe, 120 F. Supp. 2d at 121. The district court held that the state court decision was "contrary to" clearly established federal law in two ways. First, it ruled that the holding of Doyle that "prohibits cross-examination and arguments to the jury regarding a defendant's post-Miranda silence," should have governed Kibbe's claim. Id. at 121-24 (citing Doyle, 426 U.S. at 619). It further held that the appeals court erred in applying Charles because the Commonwealth did not use Kibbe's failure to provide police with a reason for his flight to expose inconsistencies between his trial testimony and his statements after his arrest. According to the district court, "The Charles rule . . . is only triggered when the defendant's trial testimony addresses the same subject matter as the defendant's post-arrest statement." Kibbe, 120 F. Supp. 2d at 123. Because Kibbe only discussed his reasons for being in the area of 171 Almira Road and not the reason for his flight from the police, the district court ruled that he had elected to remain partially silent, at least with regard to his flight, and thus, comment by the government constituted error.

---

[4] The district court declined to "fully develop" whether the appeals court decision involved an unreasonable determination of the facts in light of the evidence, providing an independent basis for habeas relief. Kibbe, 120 F. Supp. 2d at 127 n.24.

As a second basis for finding that the state court decision was contrary to clearly established federal law, the district court held that the appeals court misstated the rule of Anderson v. Charles. Id. at 125.  The state court relied, in large part, on the McClary case in rejecting Kibbe's appeal.  McClary, in turn, focused not on the inconsistency between the defendant's arrest and trial statements, but instead on the fact that the defendant chose to waive his Miranda right to silence and to answer questions posed by the police.  604 N.E.2d at 710.  The district court found that this approach impermissibly expanded the bounds for questioning a defendant regarding post-Miranda silence set out in Charles:

> The breadth of the language in McClary, however, opened the door to questioning and comments by the prosecutor with respect to any subject matter, regardless of actual or potential inconsistency, whenever the defendant makes a post-arrest statement regarding the crime.  This is not the rule of Anderson v. Charles.  The Charles case only authorizes a prosecutor to ask questions about post-Miranda omissions when those omissions are on the same topic as the trial testimony and arguably contradict it.

Kibbe, 120 F. Supp. 2d at 125-26.  To the extent that the Kibbe state court decision adopted the reasoning of McClary, it violated clearly established federal law as determined by the Supreme Court in Charles.

As an alternative ground for granting habeas relief, the district court held that the state court's adjudication involved an unreasonable application of clearly established Supreme Court law.  Id.

-11-

at 126. The district court pointedly disagreed with the appeals court conclusion that Kibbe had waived his right to silence in its entirety.[5] Instead, the district court parsed the subject of the arson and Kibbe's potential involvement into two categories: his explanation for being at 171 Almira Road on the evening of November 19, 1991, and his explanation for his flight from the police that night. Id. at 126-27. Because Kibbe did not discuss with police the reason for his flight, the district court found that Kibbe had "waived his right to remain silent with respect to some matters, but not with respect to all matters." Id. at 127.

Examining appeals court decisions from the First, Second, Fifth, Eighth, and Tenth Circuits to evaluate the reasonableness of the state court decision, the district court concluded that its own interpretation of the "Doyle-Charles framework" was correct. Id. at 127-30. While acknowledging that applicable First Circuit precedent includes only one case, Grieco v. Hall, 641 F.2d 1029 (1st Cir. 1981), in which we specifically mentioned, but failed to resolve, the exact

---

[5] It was in this disagreement that the district court explicitly held that the appeals court had made a factual determination that was clearly unreasonable in light of the evidence, but declined to determine whether the decision was based on the error. Kibbe, 120 F. Supp. 2d at 127 n.24. The district court's own interpretation of the state court decision belies the notion that the appeals court based its affirmance on the complete, rather than partial, waiver of silence, rather than on the idea that speaking to police about the crime opens the door to prosecutorial comments on omissions in one's story. We conclude that this avenue to habeas relief is a dead end.

issue that was before the Kibbe court, the district court cited Grieco as "reject[ing] the loose waiver analysis exemplified by Kibbe," id. at 128. The court stated that, "This does not mean that any time a defendant makes any post-arrest statement the door is open to full cross-examination about the defendant's failure to recount the exculpatory trial story earlier. Miranda protections apply equally to refusals to answer specific questions." Id. (quoting Grieco, 641 F.2d at 1034).

The district court found more explicit support for its conclusion that the Commonwealth committed a Doyle violation in its cross-examination and closing comments in the Fifth and Tenth Circuits. In United States v. Laury, 985 F.2d 1293 (5th Cir. 1993), the Fifth Circuit held that a prosecutor's questions and comments regarding the defendant's failure to come forward with his alibi prior to trial, despite having made exculpatory statements after his arrest, were impermissible comments on the defendant's post-arrest silence. 985 F.2d at 1303-04. Similarly, the Tenth Circuit has addressed circumstances of "partial silence," and concluded that a defendant is still entitled to Doyle protection as to silences that are not inconsistent with his trial testimony. United States v. Canterbury, 985 F.2d 483, 486 (10th Cir. 1993).

Rounding out its favorable precedent, the district court discussed United States v. Casamento, 887 F.2d 1141, 1179 (2d Cir.

-13-

1989), for its holding that the prosecutor erred in cross-examining the defendant about his silence when his pretrial and trial statements were not inconsistent. The district court concluded: "These cases demonstrate that the Kibbe decision runs directly contrary to existing federal precedent applying Charles. Thus, I conclude not only that Kibbe has the better of two reasonable legal arguments. Rather, I am firmly convinced that error occurred and that the Kibbe decision is an unreasonable outcome." Kibbe, 120 F. Supp. 2d at 130-31.

The district court went on to find that the alleged Doyle errors were not harmless, and granted Kibbe's petition for a writ of habeas corpus. Id. at 131-33.

## DISCUSSION

We agree with the district court's statements that Kibbe's habeas petition is governed by the provisions of AEDPA, and that the Williams case is the most comprehensive commentary by the Supreme Court on the proper interpretation of AEDPA. We also agree that the AEDPA provisions compel two separate analyses: (1) whether the state court decision was contrary to clearly established law as set forth by the Supreme Court; and (2) whether the state court decision effected an unreasonable application of Supreme Court precedent. O'Brien v. Dubois, 145 F.3d 16, 24 (1st Cir. 1998).[6] The district court having

_____

[6] Although the present case pre-dated the Supreme Court's Williams case, we have since held that the two-step inquiry set out in O'Brien parallels the Williams analysis and "thus remains good law." Williams

-14-

found that Kibbe was entitled to habeas relief under both the "contrary

to" and "unreasonable application" clauses, we will proceed with our

analysis in that order.  First, however, we address an argument made by

the Commonwealth that has thus far received little judicial attention.

## A.  Inference of Cooperation

In response to the various challenges to the cross-

examination and closing argument at issue, the Commonwealth has mounted

something of a hybrid defense of the prosecutor's trial references to

Kibbe's silence.  At times, the Commonwealth, relying on McClary and

Charles, has argued that Kibbe's willingness to answer police questions

about his involvement with the fire demonstrated a waiver of his right

to silence.  As such, the prosecutor was entitled to question Kibbe

about any omissions from his post-arrest statement.  Woven throughout

the Commonwealth's filings and in-court statements, however, is the

separate argument that the prosecutor's tactics were merely a

permissible attempt to counter the impression conveyed by Kibbe's

defense that he had cooperated fully with the police.

Relying on McClary, the state appeals court order declined

to comment on this cooperation justification.  The district court

rejected the argument in a footnote, stating that because Kibbe had

answered all of the questions put to him by the police, he had fully

cooperated: "He simply did not volunteer the information about why he

v. Matesanz, 230 F.3d 421, 424 (1st Cir. 2000).

-15-

fled.  He was not required to do so."  <u>Kibbe</u>, 120 F. Supp. 2d at 122
n.16.  Any impression that the defense had created that Kibbe had fully
and voluntarily cooperated was, according to the district court, simply
an accurate depiction of what had occurred.

Several circuits, including this one, have held that the
<u>Doyle</u> restriction on a defendant's post-arrest silence does not apply
when a defendant has created the impression through his testimony and
defense presentation that he fully cooperated with the authorities
when, in fact, he had not.  <u>United States</u> v. <u>Shue</u>, 766 F.2d 1122, 1129
(7th Cir. 1985); <u>Grieco</u>, 641 F.2d at 1033.  "[T]he defendant will not
be permitted to use <u>Doyle</u> as a tool to fashion an uncontradicted and
distorted version of post-arrest behavior."  <u>Id.</u>  A review of the trial
transcripts persuades us that a primary defense strategy was indeed to
convey a picture of full cooperation to the jury, without getting too
much into the specifics of just what that cooperation entailed.  When
asked what he told the police, Kibbe responded, "I told them what
happened," which prompted, "Ok.  So you explained to them what
happened, is that correct?" and "Yes."  In his opening statement,
Kibbe's counsel said of Kibbe's behavior toward the police, "[H]e
explained what he was doing and what the situation was on that
evening."  Finally, during closing argument, defense counsel stated:
"Mr. Kibbe told the police what he was up to that night.  He didn't
have to, but he did."

It may very well be true that Kibbe responded to every question that the police asked him on November 19, 1991. Unlike the district court, however, we do not believe that Kibbe's cooperation, as to the questions posed to him, entitled him to give the erroneous impression to the jury that he had provided a complete version of the events to the police, including the reason for his flight. We believe that Kibbe's defense strategy intended to convey the impression that, at trial, he was giving the exact same story he had given to the police earlier - that is, "what the situation was on that evening" - when in reality he had not. Once this trial strategy was put in place, the prosecutor was entitled to ask Kibbe whether he had told the police why he ran. We find no constitutional error in the cross-examination.

Yet, this does not end the inquiry, because the prosecutor's comments during closing argument regarding Kibbe's failure to explain his flight take a different slant than the cross-examination. In closing, the prosecutor said:

> And he tells you he runs because he is on parole, but you know he didn't tell the police that, didn't offer that as an explanation for what he was doing. In a case where you're the finders of the facts, you have to decide credibility. You have to decide credibility.

Rather than exposing Kibbe's cooperation strategy for the partial sham that it was, the prosecutor's reference to Kibbe's silence instead seems aimed at attacking Kibbe's credibility regarding the proffered

reason for his flight.  This use of Kibbe's silence arguably exceeded the permissible bounds prescribed for the cooperation exception: "[W]hile the government may use a defendant's post-arrest silence to impeach testimony about the circumstances of an arrest, the government may not then argue that the defendant's silence was inconsistent with this claim of innocence."  Shue, 766 F.2d at 1130.  "[W]e cannot uphold an interpretation of the facts in this case which would allow the exception to swallow the rule."  Grieco, 641 F.2d at 1033-34.  The Commonwealth, having emphasized Kibbe's silence to suggest that his story was "not worthy of believing," cannot now justify its actions through the safe harbor of the cooperation exception to Doyle's prohibition.  We are compelled, then, to proceed to the argument rejected by the district court that Kibbe had waived his right to silence and thus was unprotected by Doyle.

**B.  Contrary to Clearly Established Federal Law**

The district court held that the state court decision was contrary to clearly established federal law in two ways: first, in holding that Charles, rather than Doyle, controlled Kibbe's case, and, second,  in relying on McClary, an incorrect interpretation of Charles. In order to determine whether a state court decision is contrary to federal law as determined by the Supreme Court:

> [T]he key inquiry, at bottom, is whether a Supreme Court rule--by virtue of its factual similarity (though not necessarily identicality)

-18-

> or its distillation of general federal law
> precepts into a channeled mode of analysis
> specifically intended for application to variant
> factual situations--can fairly be said to require
> a particular result in a particular case.

O'Brien, 145 F.3d at 25 (emphasis added). The category of cases falling under the "contrary to" prong should not be conceived so broadly as to "sap the 'unreasonable application' clause of any meaning." Phoenix v. Matesanz, 233 F.3d 77, 80 (1st Cir. 2000).

Turning to the case at hand, the appeals court decision would be contrary to clearly established federal law if a reading of Doyle, in conjunction with Charles, compelled a contrary outcome. The Charles interpretation of Doyle states that: "The case involved two defendants who made no postarrest statements about their involvement in the crime." Charles, 447 U.S. at 407. The Supreme Court in Doyle faced a question different from that presented in the state court to the extent that Kibbe did not rely on his right to remain silent, but instead answered all police questions relating to his potential responsibility for the fire.

We find this distinction significant on the question of whether Doyle requires a finding of a due process violation in this case, especially in light of the fact that the Supreme Court has allowed prosecutors to comment on a defendant's post-arrest silence in multiple circumstances. Charles admits of some use of a defendant's post-arrest silence to expose prior inconsistent statements. Further,

-19-

a defendant's silence may be used for impeachment purposes when a defendant has not received Miranda warnings. Fletcher v. Weir, 455 U.S. 603, 606-07 (1982); Jenkins v. Anderson, 447 U.S. 231, 239 (1980). These cases caution against an absolute and expansive construction of Doyle's mandate, especially considering the particular factual circumstances found here.

In our view, Doyle cannot be extended so far as to compel a contrary outcome in Kibbe's case. Indeed, were the outcome so obvious, there would have been no reason for us to leave unresolved the question of whether Doyle or Charles should apply "to a situation where the defendant has not maintained silence after arrest, but has made exculpatory post-arrest statements which are not themselves inconsistent with the exculpatory trial story, but which relate to a different subject matter." Grieco, 641 F.2d at 1036. The district court's finding that Kibbe maintained his silence as to the reason for his flight and that therefore Doyle necessarily applies is an extrapolation more appropriate for an "unreasonable application" analysis than for the "contrary to" analysis.

## C. "Unreasonable Application" of Supreme Court Precedent

Absent a clearly controlling Supreme Court rule that is dispositive of a petitioner's claim, the federal habeas court must determine "whether the state court's use of (or failure to use) existing law in deciding petitioner's claim involved an unreasonable

-20-

application of Supreme Court precedent." O'Brien, 145 F.3d at 24. A state court decision may be set aside as an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 408. This analysis distills to a "question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable." O'Brien, 145 F.3d at 25 (emphasis added); accord Williams, 529 U.S. at 409-10 (holding that the assessment of unreasonableness demands an objective analysis).

Because of this broad objective standard, a federal court cannot grant habeas relief simply because it disagrees with or finds an error in the state court's application of federal law. See id. at 410. In the end, a state court decision is objectively unreasonable under AEDPA only if it is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." O'Brien, 145 F.3d at 25; Williams v. Matesanz, 230 F.3d 421, 425 (1st Cir. 2000) (affirming "the outside-the-universe-of-plausible-outcomes" test).

In the instant case, the district court held that the state court unreasonably applied clearly established federal law by extending Charles to the facts of Kibbe's case. More specifically, the district court ruled that the Kibbe court's attempted application of Charles "is devoid of record support" given the significant factual dissimilarities between the two cases. Kibbe, 120 F. Supp. 2d at 126. The district court noted that Charles authorized a prosecutor to ask questions about post-Miranda omissions when those omissions were on the same topic as the trial testimony. In Kibbe's case, however, the prosecutor commented on the defendant's post-Miranda omissions, even though those omissions did not relate to the subject matter of the trial testimony. Because of this discrepancy, the district court concluded that the state court had unreasonably applied Charles to Kibbe's case.

The district court discovered a second unreasonable application of federal law when it found that the Kibbe decision contradicted several federal circuit court cases. The district court held that the state court's decision - and, more specifically, the application of Charles to Kibbe's case - was an anomaly: a decision that was in such contrast with existing federal precedent as to be "offensive."

Though the district court's interpretation of federal precedent and its analysis of post-arrest silence issues may be correct, our analysis here is confined to determining the

-22-

reasonableness, not the accuracy, of the state court's decision. Again, neither disagreement with nor the existence of an error in a state court's decision is enough to set aside a conviction under AEDPA.

With these guiding principles, we next consider whether the state court's decision in Kibbe is objectively reasonable - whether it falls "outside the universe of plausible, credible outcomes." O'Brien, 145 F.3d at 25. In assessing the reasonableness of the Kibbe decision, it is important to reiterate that the facts of this case fall outside of any clearly established Supreme Court precedent, most notably Doyle v. Ohio and Anderson v. Charles.

In Doyle, the Court held that a prosecutor could not impeach a defendant's exculpatory story told for the first time at trial by cross-examining the defendant about his failure to recount the story upon his arrest. 426 U.S. at 619. Unlike Doyle, where the defendants remained completely silent after being arrested, Kibbe made a post-Miranda statement to police about the crime.

The facts of Kibbe's case do not fall squarely within Charles, either. The Charles Court ruled that when a defendant makes a post-Miranda statement on a particular subject, and then makes a second statement on the same subject at trial, a prosecutor can refer to post-arrest silence to expose any inconsistencies between the two statements. 447 U.S. at 409. Unlike Charles, however, Kibbe's testimony at trial dealt with a subject matter not addressed in his

-23-

post-arrest statements - that is, the reason for his flight.  Thus, neither <u>Doyle</u> nor <u>Charles</u> dealt with the situation presented here: where Kibbe made a post-arrest statement, which was not inconsistent with his trial testimony.

Because of this unresolved issue, the likelihood increases that there are other reasonable, yet contradictory, interpretations of Supreme Court precedent.  One clear interpretation of the <u>Doyle</u>-<u>Charles</u> framework argues, as the district court did, that when a defendant has waived his right to remain silent, a prosecutor's inquiry into the defendant's post-arrest silence is limited to exposing inconsistencies between the defendant's post-arrest statement and trial testimony. <u>Kibbe</u>, 120 F. Supp. 2d at 127.  However, an alternative interpretation argues, as the state court did, that when a defendant waives his right to remain silent and answers questions about the crime, a prosecutor can inquire into the defendant's post-arrest silence to expose <u>any</u> differences between the defendant's post-arrest statement and trial testimony, not just prior inconsistent statements.

Through a credible interpretation of federal precedent, it is quite plausible for a court to arrive at the <u>Kibbe</u> court's decision. First, a court could argue, as some have, that <u>Doyle</u>'s prohibition on inquiring into a defendant's post-arrest silence only applies when the defendant invokes his right to remain silent.  <u>See</u> <u>Charles</u>, 447 U.S. at 407 (characterizing <u>Doyle</u> as a "case that involved two defendants who

made no postarrest statements about their involvement in the crime");

United States v. Ochoa-Sánchez, 676 F.2d 1283, 1286 (9th Cir. 1982) (noting that in a situation in which the defendant does not remain silent, the controlling authority is Charles, not Doyle).  Second, though the Charles Court only authorized a prosecutor to comment on post-arrest silence when omissions reveal inconsistencies between the post-arrest statements and the trial testimony, a court could plausibly argue that this holding should be extended to cover the facts of Kibbe's case.  In both cases, defendants voluntarily waived their right to remain silent and offered trial testimony that was at variance with their post-arrest statement, either because information was omitted as in Kibbe or because inconsistent versions were given as in Charles. Because the thrust of the Charles holding was aimed at exposing defendants' multiple and diverging version of events, a court could credibly conclude that Charles should be read to allow a prosecutor to probe any differences between post-arrest statements and trial testimony, including a defendant's failure to provide important information at the time of arrest.

Furthermore, there is support for the Kibbe decision in existing case law.  In Ochoa-Sánchez, the defendant's car was stopped and inspected by customs officials at the San Ysidro Port of Entry. 676 F.2d at 1284.  Upon finding heroin in the vehicle, officials arrested the defendant and gave him the Miranda warnings.  The

-25-

defendant then waived his right to remain silent and made exculpatory statements.  Id. at 1286.  At trial, the defendant testified to information and details that he omitted from his post-arrest statement, and the prosecutor inquired into these omissions, even though some of the omissions differed from - but were not necessarily inconsistent with - his post-arrest statement.  Id. at 1287.  The court found the prosecutor's inquiry and comments regarding the omissions permissible because the defendant's trial testimony raised an issue of credibility, and the prosecutor "argued vigorously in closing argument about the credibility of defendant's trial testimony."  Id.

As in Ochoa-Sánchez, the prosecutor in Kibbe exposed the differences between the defendant's trial testimony and post-arrest statement by emphasizing an important omission - Kibbe's failure to explain his flight upon his arrest.  This divergence gives rise to an issue of credibility.  Following the ruling in Ochoa-Sánchez, the prosecutor in Kibbe proceeded to question the credibility of the defendant by focusing on the omission: "And [the defendant] tells you he runs because he is on parole, but you know he didn't tell the police that, didn't offer that as an explanation for what he was doing.  In a case where you're the finders of the facts, you have to decide credibility."

More explicit support for the Kibbe decision can be found in United States v. Goldman, 563 F.2d 501 (1st Cir. 1977).[7] In Goldman, the defendant made an exculpatory statement during an interrogation by a federal agent, but refused to respond to two of the agent's questions. Id. at 503. At trial, the prosecutor commented on the defendant's failure to respond to these questions, and we upheld the prosecutor's conduct. This Court reasoned that because the defendant had waived his right to remain silent, he "dispell[ed] the particular prejudice feared by the Supreme Court that the jury would draw a 'strong negative inference ... from the fact that the defendant remained silent at the time of his arrest.'" Id. at 504 (quoting United States v. Hale, 422 U.S. 171, 180 (1975)). Thus, if a defendant talks, anything that "'he says or omits is to be judged on its merits or demerits.'" Id. (quoting Vitali v. United States, 383 F.2d 121 (1st Cir. 1967)). This waiver analysis permitted the prosecutor to comment on any omissions in Kibbe's post-arrest statement by virtue of the fact that the defendant did not invoke his right to remain silent.

As further support for the reasonableness of the state court decision, this Court in Grieco left unresolved the specific issue

[7] Though Goldman pre-dates the Charles opinion, the Charles Court cited Goldman positively. Charles, 447 U.S. at 2182. Furthermore, the waiver analysis in Goldman is still employed in the Second Circuit, which allows prosecutors to comment on omissions in a defendant's post-arrest statements when the defendant refuses to testify at trial. See, e.g., Bradley v. Meachum, 918 F.2d 338, 343 (2d Cir. 1990).

presented here. Grieco explicitly left open the question of whether Doyle or Charles should apply "to a situation where the defendant has not maintained silence after arrest, but has made exculpatory post-arrest statements which are not themselves inconsistent with the exculpatory trial story, but which relate to a different subject matter." 641 F.2d at 1036. Had the application of Charles to such a scenario been so "offensive" or "arbitrary," it is unlikely that this Court would have left the issue unresolved. Furthermore, given its limited scope of review under AEDPA, a federal habeas court ought not provide the definitive answer to this open question.

## CONCLUSION

Given that the state court's analysis of the Doyle-Charles framework rests upon a plausible interpretation of Supreme Court precedent, considering the case law that supports the Kibbe decision, and noting that the Grieco court left the specific issue addressed in Kibbe unresolved, we hold that the state court's decision is objectively reasonable, as it does not fall "outside of the universe of plausible, credible outcomes." For these reasons, we reverse the district court's decision to grant Mark Kibbe's petition for the writ of habeas corpus.

**Reversed.**

(Concurrence follows)

**LYNCH, Circuit Judge (concurring in the judgment).** I concur in the judgment reversing and vacating the district court's grant of habeas corpus.

The standard of reasonableness we must use in evaluating the state court's decision is that articulated by the Supreme Court in Williams v. Taylor, 529 U.S. 362 (2000).[8] In that case, Justice O'Connor (commanding, for this part of her opinion, a majority of the Court) read 28 U.S.C. § 2254(d)(1)'s limitation on the federal courts' power to grant writs of habeas corpus to mean that "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." 529 U.S. at 411. The Court warned, however, that a court "should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the

_____

[8] I do not agree that the standard this Circuit applied in O'Brien v. Dubois, 145 F.3d 16 (1st Cir. 1998), at least as it is literally read, is equivalent to or consistent with the Williams standard. See id. at 25 ("[F]or the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes."). In my view, this particular holding of O'Brien -- the "outside the universe of plausible, credible outcomes" test -- has been overruled. Other aspects of O'Brien remain sound. Nevertheless, this is not the case to resolve the issue, as either standard would yield the same result here. For this reason, I do not engage in exposition of my reasoning. For the same reason, I consider the majority opinion's use of O'Brien dictum.

relevant federal law in the same manner the state court did." Id. at 410. In applying § 2254(d)(1), as in assessing the novelty of law under Teague v. Lane, 489 U.S. 288 (1989), "the mere existence of conflicting authority" does not resolve the question. Williams, 529 U.S. at 410 (quoting Wright v. West, 505 U.S. 277, 304 (1992) (O'Connor, J., concurring in the judgment)) (internal quotation marks omitted). Moreover, the Court rejected the test advanced by the Fourth Circuit that permitted the grant of habeas only if "reasonable jurists would all agree" that the state court erred in applying federal law. Id. at 409 (quoting Green v. French, 143 F.3d 865 (4th Cir. 1998)) (internal quotation marks omitted).

I would reverse the grant of habeas for either of two reasons, alone or in combination. First, when Kibbe argued at trial that he had cooperated with the police on the night of his arrest, he opened the door to a full development of his actions, at least on the issue of cooperation. This reasoning predates Doyle v. Ohio, 426 U.S. 610 (1976), and was cited with approval by the Court in that case. See United States v. Fairchild, 505 F.2d 1378, 1383-84 (5th Cir. 1975), cited in Doyle, 426 U.S. at 619 n.11. Similar analyses continue to appear in decisions by federal circuit and state supreme courts. E.g., United States v. Reveles, 190 F.3d 678, 683-85 (5th Cir. 1999); Earnest v. Dorsey, 87 F.3d 1123, 1135 (10th Cir. 1996); Pennycuff v. State, 745 N.E.2d 804, 812-14 (Ind. 2001). Our own Grieco v. Hall, 641 F.2d 1029

-31-

(1st Cir. 1981), acknowledges, although it does not apply, the holdings of the cooperation cases.  Id. at 1033-34.  In my view, Kibbe opened the door sufficiently wide to admit both the cross-examination and the prosecutor's single comment in closing.  The latter comment regarded Kibbe's explanation for his flight, and the question why he fled is sufficiently bound up with the question whether he cooperated that I do not think the comment violated due process of law.  That rationale alone supports the outcome reached by the state court, and it is the outcome reached by that court's reasoning, rather than the path it followed, that we must ultimately assess.  Hurtado v. Tucker, 245 F.3d 7, 20 (2001).

Second, even if an analysis based on Kibbe's decision to use a cooperation theme is rejected (as it should not be), and the case is placed somewhere on the Doyle-Charles spectrum, the state decision is simply not an "unreasonable application of . . . clearly established Federal law . . . as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (Supp. II 1996).  That is all we need decide and I prefer not to engage in extensive discussion in dicta of possible developments in the law in this area.